Bernard McLaughlin et al., Appellants, *v.* William McDevitt et al., Respondents.

Where a change is made in the will of a sick man which, judging from the ordinary motives actuating men, is unnatural and is apparently contrary to his previous fixed and determined purpose, it is the duty of the courts to scrutinize closely with a view of ascertaining whether the act was free, voluntary and intelligent.

To establish fraud and undue influence in such case it is not necessary that the precise mode of committing the fraud should be proved.

Where it is found upon evidence justifying it that a beneficiary under the will had an intent to defraud the testator in order to procure a personal advantage to himself in the will, that he had opportunity to practice deception and employed some of the means usually resorted to for that purpose, that a result was produced in his favor contrary to the known wishes and fixed purpose of the testator; and that no satisfactory explanation of the change was furnished, the legitimate result of the findings is that the will is vitiated by fraud.

(Argued November 12, 1875; decided November 23, 1875.)

Appeal from judgment of the General Term of the Supreme Court in the second judicial department, affirming a decree of the surrogate of Kings county refusing to admit to probate an alleged codicil to the last will and testament of Neil Dougherty, late of the city of Brooklyn, deceased.

The facts are set forth sufficiently in the opinion.

*David R. Garniss* for the appellants. To vitiate a will or an instrument, fraud or undue influence must be established by clear and substantial evidence; it cannot be inferred. (*Sullivan* v. *Warren*, 43 How. Pr., 188; *Hildreth* v. *Sands*, 2 J. Ch., 35; *Jackson* v. *King*, 4 Cow., 207; 1 Greenl. Ev., § 254; Redf. on Wills, pt. 1, pp. 509, 510; 3 Bradf., 320; 34 N. Y., 162; 35 How. Pr., 336; 1 Redf., 220.) The term will, as used in the statute, includes codicils. (2 R. S., 68, § 71; *How* v. *Un. Theo. Sem.*, 4 Sandf., 82; *Seymour* v. *Van Wyck*, 2 Seld., 120.) Fraud and undue influence is an influence exercised by coercion, imposition or fraud. (*Seguine* v. *Seguine*, 33 How. Pr., 336; *Kinne* v. *Johnson*, 60 Barb.,

69; *Mountain* v. *Bennett*, 1 Cox, 355.) It must be shown
to have arisen from threats, force or coercion, destroying free
agency. (Will. on Exrs., 91, 92; *Gardner* v. *Gardner*, 22
Wend., 526; *Williams* v. *Goude*, 1 Hagg., 581; *Allen* v.
*Pub. Admr.*, 1 Bradf., 378; 1 Jarm. on Wills, 40; 34 N. Y.,
162; 41 Penn., 312; 4 Greenl., 220; *O'Neall* v. *Farr*, 1
Rich., 80, 84; *Eckert* v. *Flowry*, 43 Penn., 46; 8 Har., 329;
Redf. on Wills, pt. 1, pp. 524, 526, 528; *Floyd* v. *Floyd*, 3
Strobh., 44; *Woodward* v. *James*, id., 522; *Means* v. *Means*,
5 id., 167; *Gardner* v. *Gardner*, 22 Wend., 526; *Lowe* v.
*Williamson*, 1 Greenl. Ch., 82; *Potts* v. *House*, 6 Ga., 324;
*Sutton* v. *Sutton*, 5 Har., 459; *Morris* v. *Stokes*, 21 Ga., 552;
*Leverett* v. *Carlisle*, 19 Ala., 80; *Dunlap* v. *Robinson*, 28
id., 100; *Taylor* v. *Kelly*, 31 id., 59; *Marshall* v. *Flynn*, 4
Jones' Law, 199.)

*Jesse Johnson* for the respondents. Persuasion used to a
testator on his death-bed may amount to force and inspiring
fear; and in such a case persuasion is undue influence. (*Lee*
v. *Dill*, 11 Abb. Pr., 217; *Tyler* v. *Gardiner*, 35 N. Y.,
592; *Delafield* v. *Parish*, 25 id., 35, 92; *Lake* v. *Ranney*,
33 Barb., 49; *Bergen* v. *Udell*, 31 id., 9, 25; *Crispell* v.
*Dubois*, 4 id., 397; *Marsh* v. *Tyrell*, 2 Hagg., 87, 110;
*Barry* v. *Butlin*, 1 Curtens, 638.)

Church, Ch. J. The testator, Neil Dougherty, a resident
of the city of Brooklyn, died on the 16th day of September,
1874, leaving a will, which was dated and executed August
27, 1874, and a codicil without date, but executed September 5, 1874. The will was admitted to probate by the surrogate, and the codicil refused probate on the ground that it
was procured by fraud and undue influence, and the General
Term affirmed the decree of the surrogate, refusing probate
to the codicil. No appeal has been taken from the decree
admitting the will to probate. The question is therefore
confined to the validity of the codicil. The testator was of
Irish birth, from fifty-five to sixty years of age, a bachelor,

and, as was generally understood, at the time of his death
without relatives. A sister who had lived with him had
died a few years previous. He seems to have been very
economical and penurious, and had accumulated property
worth from $45,000 to $60,000, consisting of a building,
partly occupied by himself for a grocery and to reside in,
and partly rented, worth about $30,000 ; a vacant lot, and
about $15,000 in money, on deposit. It may be inferred
that the property was the accumulation of the joint earnings
of himself and sister. He had been confined to the house
several weeks before his death with a disease which his physi-
cians had, from time to time, advised him was incurable, and
of which he died. The will was drawn by J. Z. Lott, a
practicing lawyer, who had been the legal adviser of the
deceased, and witnessed by himself and one Kimball, also a
lawyer. By the will, after giving a legacy of $100 to an old
lady who had attended him, $200 to Bernard McLaughlin,
and $1,000 to a Catholic orphan asylum in Brooklyn, he gave
the residue of his property to the Catholic bishop of Raphoe,
in the county of Donegal, Ireland, in trust, to found a school
for poor Catholic children, and made the said Bernard
McLaughlin and James J. Garvey executors. By the codi-
cil, the bequest of $1,000 to the orphan asylum in Brooklyn
was changed to Rev. F. G. Freel, a Catholic priest, with direc-
tions to apply it to such charities as he might designate; a
legacy of $12,000 was given to McLaughlin, together with
the use of the store and effects for four years; and Hugh
Doherty was substituted as executor for James J. Garvey.
The allegations of fraud and undue influence are made on
account of the legacy, contained in the codicil, to Bernard
McLaughlin.

It seems that the charity provided for in Ireland had been
the cherished purpose of the testator and his sister during
their lives, and to the success of which he was religiously
devoted. McLaughlin was, it is true, a personal friend of
deceased, and was made an executor in his will, and a legacy
of $200 was given him, but there are no facts tending to

show any intention on the part of the testator to give him so large a portion of the fund set apart for the endowment of a charity which he had long contemplated as the crowning act of his life, and no reason furnished for such a gift. An explanation was attempted by the evidence of a real estate broker, who stated that the testator applied to him to purchase a house or store, and said he was purchasing it for McLaughlin, but this occurred a year or more before the death of the testator, and there is not a word in the evidence indicating a purpose to donate the house, or any · part of the purchase money. Besides, any such idea is repelled by the fact that in the will the legacy to McLaughlin is put at $200, and by the evidence of Mr. Lott and Mr. Kimball, that when the attention of the testator was directed to it, he promptly stated that it should be $200, and no more. The evidence of Mr. Freel, who was the' spiritual adviser of the testator, is also very important as to his purpose in disposing of his property. He says the testator told him that he had made a will to establish an educational institution in Ireland; that the desire had been a life-long desire, and had been the object of his life, and not only his, but the life of his sister; and that he counted up the years of labor which he and his sister had given to this work, and that it was about 100 years. This witness also stated that afterwards he reminded him of the charitable institutions of the city, "but when I saw his desire and his determination to persevere in it, I said that was a very good arrangement." He said that the testator told him of the change of the $1,000 to him instead of the orphan asylum, but mentioned no other change in his will. The witness stated that he knew McLaughlin had a small legacy in the will; and in one conversation suggested the propriety of leaving something to him to remunerate him for his services, and further testified, "he immediately objected to that, and said 'no, he will be paid for his services.' I knew he had left a small amount in the will, and I thought he should have something more; he immediately objected, and said, 'he will be paid;' he meant by that, to have what the law allowed

to an executor in the case." This witness appears to have been candid and truthful. It is a significant circumstance, that the testator, who was a devoted Catholic, when talking with his spiritual adviser, in whom he confided, should not have informed him of the change he had made in favor of McLaughlin, or, at least, that he had made some change in his favor, especially after the suggestion that he ought to do so.

A testator has, of course, a right to change radically and arbitrarily, the manner of disposing of his property, and, in the absence of fraud, courts will sustain his action in this respect; but when, according to the ordinary motives which operate upon men, we find an unnatural change made in a sick man's will, and one apparently contrary to his previous fixed and determined purpose, it is the duty of courts to scrutinize closely the circumstances, with a view of ascertaining whether the act was free, voluntary and intelligent. In this case it was testified to by Mr. Lott, who drew the will, that while he was engaged in rewriting and consolidating a will and codicil which had been executed the day before, he was approached by McLaughlin, who stated to him that the testator had not done the good thing by him, and offered to give him $100 if he would make the legacy $2,000, and read it to the testator as $200; that, when he did read it to the testator, he asked the testator whether he intended that legacy to be 200 or 2,000, and the latter replied promptly and sharply, 200; and this was in the hearing of McLaughlin. This is corroborated by the other witness to the will, Kimball, who also testified that McLaughlin said to him, immediately after, that testator was " a d — d old fool," or an " old fool."

During his sickness, and especially after the will was executed, McLaughlin was the constant attendant of the testator, and had charge of him; the only other person about him was Mrs. Kane, who did the work about the rooms, and appears to have been a weak old lady, having no very clear ideas of what was done. There is also evidence tending to show that

the friends of the testator were excluded, and that no one was allowed access except the physician and Mr. Freel; and the testator said on one occasion that his friends had all deserted him. The codicil was prepared by Mr. Cooney, a lawyer, who was a stranger to the testator, but who had done business for McLaughlin, and who drew the codicil at the latter's request; and it was witnessed by Cooney and another person, Mr. Ryer, at the request of Cooney. It is fairly inferable that McLaughlin was present, or at least within hearing when the testator gave instructions to Cooney, and when the codicil was executed, although he testified that he didn't know of it until after the death of the testator. In this he is expressly contradicted by Cooney, who says he told McLaughlin he was in for $12,000. The instructions of the testator, as testified to by Cooney, in respect to the legacy to McLaughlin, were given without explanation or reason. He stated that the testator said that he had been thinking of doing something for McLaughlin, and thought he would do it now, and then directed a legacy of $10,000, and a few minutes after told him to make it $12,000. Cooney testifies he made a memorandum of the instructions in pencil, which he afterwards burned up, but omitted to state that there was any thing in the instructions about the use of the store and effects, for four years, until his attention was afterwards called to it. Ryer, the other witness to the codicil, did not recollect precisely what took place at the execution. He says the codicil was read, but he fails to say that he heard it, or that he knew any of its contents. McLaughlin was particularly attentive in procuring the execution of the codicil; he employed his own lawyer, accompanied him to the house for instructions, returned to the office and remained while it was being written, and again accompanied him to the house, and was near by at its execution, and finally paid the lawyer for his services twenty-five dollars, taking a part of the money, as he says, from the chest of the testator and a portion from his own pocket. It does not appear that any other person knew of the change in the will in favor of McLaughlin, or

that the testator ever intimated to any one an intention to give him more than the legacy of $200; and the testimony of Mr. Freel tends strongly to show that he did not suppose any such change had been made.

The bequest of the use of the store for four years is extraordinary; and the bequest of the *use of the effects*, consisting of a small stock of groceries, still more so; and Mr. Cooney did not say that the testator instructed him to put those in.

The counsel for the proponents of the codicil strenuously urged that neither fraud or undue influence had been proved, and cited various authorities to establish the proposition that, when testamentary capacity and the execution of the instrument are proved, it should be admitted to probate, unless facts were shown to make a case of fraud or undue influence within the established definitions. But in this case the beneficiary was proved to have attempted a gross fraud upon the testator to procure an additional sum in his own favor in the will. Failing in that, he engages his own lawyer, and is very officious in procuring the execution of the codicil which increases the bequest from $2,000, which he first attempted to procure by fraud, to $12,000, besides the use of the real estate. During this period he had access to and was the only person who had the care, control and management of the deceased. The bequest in his favor is contrary to the repeatedly expressed intentions of the testator; and there is evidence that he kept the testator excluded to some extent from association with his friends. Under such circumstances " it behooves the beneficiary to be provided with evidence that the instrument expresses the honest, spontaneous purpose" of the testator to reverse his previous testamentary disposition. True, it does not appear precisely what the means employed were. The testator was incurably sick; it was eleven days before his death, and whether the testator was so managed as to give the instructions, or whether he failed to understand the effect of what was done, does not appear.

The surrogate was justified, from the evidence, in holding

that McLaughlin had an intent to defraud the testator, in order to procure a personal advantage to himself in the will; that he had opportunity to practice deception and employed some of the means usually resorted to for that purpose; that a result was produced in his favor, contrary to the known wishes and fixed purpose of the testator, and that no satisfactory explanation for the change was furnished. Being justified in so finding, and, we must assume, having so found, it was a legitimate, if not a necessary result, to hold, that the codicil was vitiated by fraud. The surrogate had the advantage of seeing the witnesses, of observing their appearance and manner of testifying, and a better opportunity than an appellate court can have of judging of their credibility. This advantage is more than usually important in this case, and would turn the scale in favor of the decision if the case was more evenly balanced than it is. I cannot say, from the record, that the decision was erroneous; on the contrary, after a careful examination of the evidence, I am impressed with the conviction that it was right. It is not indispensable that the precise mode of committing the fraud should be proved; if the circumstances raise a legitimate presumption of fraud it is proper to so find, in the absence of sufficient explanation.

The judgment must be affirmed, with costs in this court to the respondents and to Hugh Doherty, appellant, against whom no bad faith is shown, to be paid out of the estate, and without costs in this court to or against McLaughlin.

All concur.

Judgment affirmed.