Testator was 60 years old when he died, and for several years had been ill with a disease which always affects the mental powers to a certain extent, and during the last two weeks he suffered great pain. He had been married three times, and had children by his first and second wives, but none by his third. About two hours before his death he executed a will giving all his property to his wife, to the exclusion of his children. He had frequently, and as late as two hours before executing the will, declared that he did not intend to make a will, as his children were equally dear to him, and his wife's share, with her separate property, would be

sufficient for her. He also stated several times, shortly before his death, that his wife was "bothering" him to make a will, but that he did not intend to do so. The scrivener and witnesses were brought to the house by testator's wife. *Held*, that the probate would be denied on the ground of undue influence.

Application for the probate of the alleged will of Frederick W. Nolte, deceased. Denied.

Ullo, Ruebsamen & Cochran, for proponent.

Isaac P. Hubbard and John F. Ward, for contestants.

WELLER, S. After a careful review of all the facts, and mature consideration, I am satisfied the will in this case should not be admitted to probate. The decedent was a man 60 years of age, had been ill for a long time, exceedingly weak in body and mind, and died about two hours and a half after the execution of the will. He had Bright's disease of the kidneys,—a disease which always, more or less, affects the mental capacity of its victim. He had suffered from it for several years, and during the last two weeks of his life he was a great sufferer. He had been married three times, having children by his first and second wives, but none by his third wife. His third wife, the proponent of the will, is a woman of great mental and physical vigor; has a keen appreciation of her own interests; and the proof shows she never neglected an opportunity to enhance her worldly possessions. The decedent bought real estate, the title of which was taken in the joint names of himself and his wife, valued at between $3,000 and $4,000, all paid for by him, and the whole title of which she gets by survivorship. She had also accumulated, unbeknown to the decedent, between $1,400 and $1,500. She had also in her own right a house in 127th street, New York City, worth $5,000 or $6,000. Now, between two and three hours before his death, the decedent executed the alleged will giving to this wife, by whom he had no children, all of his property of every kind, nature, and description, cutting off his children without a cent, some of whom were quite young. From beginning to end the evidence shows that he was very fond of his children. Nothing had come between them to estrange him from them. On the contrary, it appears from the testimony that within one or two days of his death he declared his intention to treat his children all alike, as they were all equally dear to him. Mrs. Dorothea Adam testifies that the decedent frequently declared in her presence that he would not make a will; that his children were all alike dear to him. Frederick Bergmann, Sr., brother of proponent, testifies that on the 11th day of December, two days before he died, at the decedent's request, he went to him, and decedent said "he would not make his will, as all his children were the same to him; they were all as one to him, and that he would give them the same." He further said: "My wife will get the house what is her own, and that is enough, and she will get a third besides." Hugo Adam testifies that he was at the house of decedent at 8 o'clock on the night of his death, and, about two hours before making the will, decedent said to witness: "I want all my children to have the same if I should die or anything happened to

me." Other witnesses testify that he had frequently said, but a little while before his death, that he wanted his children all to have the same, and that he did not intend to make a will.

Now, what was it that came between him and his children between 8 and 10 o'clock in the evening of the day of his death that should induce him to change the whole current of his intentions towards his children, and to get him to make a will cutting them all off without a dollar, and giving everything to his wife? This third wife, powerful, vigorous, mentally and physically, almost alone surrounding him during the last two weeks of his illness, gets all his property by this alleged will. Suspicion at once attaches to a will giving to a person with such power and influence all that he possesses in this world, to the exclusion of other beloved ones, and who were equally the natural object of his bounty. It was her duty, under the circumstances, to clearly establish that the will was executed free from all influences, and was his intelligent, voluntary act. "The rule is well understood that where the will of a sick person is contrary to his previous declarations and fixed purpose, it is the duty of courts to scrutinize closely with a view of ascertaining whether the act was free, voluntary, and intelligent." McLaughlin v. McDevitt, 63 N. Y. 213, and especially at pages 217, 219, 220. And "a change of previously expressed intentions, as bearing upon the allegation of undue influence in procuring a will, is an important circumstance." Horn v. Pullman, 72 N. Y. 276. The sole beneficiary under the will (the third wife), from the testimony, appears to have been constantly beseeching the decedent to make a will in her favor. Roman Adam testifies that about two or three weeks before his death the decedent said to him: "My wife is bothering me so much in regard to making a will, and I do not want to do it." And the same witness testifies: "My wife is bothering me to make a will. I will not do it. My children are alike dear to me, and my wife is well enough off. She has got enough to live on; has her own house." On the same page the same witness said that he was there at the house on the Sunday before he died, and, after Mrs. Nolte and the doctor went out of the room, the decedent said: "I am very weak; I feel very weak, but I believe I will not make a will anyway. My children are all alike dear to me; I will not make a will." And the witness continued: "Then his wife came in, and he kept quiet." On the cross-examination the same witness further testifies that decedent said, on November 30, 1883: "I do not know what it is; I have so much trouble. My wife is bothering me to make a will. My children are all alike dear to me. I do not want to make a will." Frederick Bergmann, Sr., brother of proponent, testifies that decedent had very often said he would not make a will, and further said that his wife had very often asked him to make his will, but that he had refused and told her so. On the cross-examination the same witness further said that decedent stated: "My time is nearly gone; I shall not stay long here. I will not make a will. One child is as dear to me as another. My wife has a house belonging to herself, and then she has the one-third part. She is well taken care of." I do not find in the minutes any denial by Mrs. Nolte herself

that she had importuned the decedent to make a will as testified to by the witnesses. Thus we find the decedent constantly reiterating that his children were all alike to him, and that he did not intend to make a will discriminating against them, and constantly resisting the importunings of this wife to make a will in her favor, down to within a few hours of his death. And yet, within two hours after the declaration that he wanted all his children to have the same if he should die or anything happen to him, he makes a will giving everything to his wife, and cutting his children off without a dollar. Mrs. Nolte admitted to Dorothea Adam that she had "tried hard to get her husband to make his will, but I cannot get him to do so."

All this testimony throws around the document great suspicion. But the mode and manner of securing its execution increases the suspicion that the will was forced from the decedent (while he was in a weak mental condition) by the beneficiary. She (Mrs. Nolte) sent for Mr. Howard to draw the will. She also sent for the witnesses, and she herself admits that she sent for the witnesses. Mr. Hugo Adam, whom Mrs. Nolte sent for, the scribe who drew the will, testifies that when he returned with Mr. Howard he asked her if he should go up stairs with Mr. Howard, and she said: "No; she would go up first, and give him [decedent] some wine." This witness further testifies that she would not allow either Mr. Howard or himself to go up until she had gone upstairs herself first, and given the decedent some wine; that she was gone up stairs 10 minutes before she came down and allowed Mr. Howard to go up; and that when Mr. Howard started to go up she stepped between him and Mr. Howard, and told him to "stay down stairs, and send up the witnesses as soon as they came." Mrs. Nolte went upstairs with the scribe, and remained there all the time the will was being drawn and executed, and none of the family except Mrs. Nolte was in the room at the time of its execution. The will was immediately given to Mrs. Nolte, and the decedent never possessed it. In about two hours and a half the decedent died, and about half an hour afterwards Frederick Bergmann, Sr., brother of Mrs. Nolte, came to the house, and she exclaimed to him: "Mr. Nolte has made his will; everything belongs to me. I am saved."

I am satisfied from the whole evidence that Mrs. Nolte exercised that great influence which she had acquired over him, and destroyed the decedent's free will and agency, thereby making his mind subservient to her own, while he was in a condition so feeble as to make it necessary to give him stimulants to enable her to carry out her scheme. Again, I am not satisfied that at the time of making the will, about two hours before his death, the decedent had mental capacity sufficient to make a will. He lived but two hours and a half, and various witnesses testified that before the will was made he had rattling in his throat indicating the near approach of dissolution. And at the time that Mrs. Nolte told Hugo Adam to go for the scrivener the doctor said to him: "Do you think he has his senses?" The doctor himself has not been produced, and it is the duty of Mrs. Nolte to throw all light possible upon the mental condition of the decedent, and around the mode and manner of the

execution of the will. Why does she not produce the doctor? The decedent was afflicted with a disease that sooner or later affects the mind. The decedent had refused constantly her importunings to make a will, and finally, within two hours of his death, she gets him to make a will contrary to his repeated intent, cutting off all of his children, whom he dearly loved, and making her, who was already well provided for, the sole beneficiary of all his property. I cannot believe that the decedent made this will uninfluenced by his wife and while he was in his right mind. The will must be rejected. Let a decree be entered accordingly. Probate denied.