## In re ELLWANGER'S WILL.

(Surrogate's Court, Monroe County. July 22, 1908.)

1. WILLS (§ 31*)—TESTAMENTARY CAPACITY—DEGREE OF MENTAL CAPACITY RE-
   QUIRED.

   A person making a will must have sufficient capacity to comprehend perfectly the condition of his property, his relations to the objects of his bounty, and the scope of the provisions of his will, and sufficient active memory to collect in his mind, without prompting, the particulars of the business to be transacted and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other and to be able to form some rational judgment with relation to them.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 66–68; Dec. Dig. § 31.*]

2. WILLS (§ 179*)—REVOCATION—SUBSEQUENT WILL—SUFFICIENCY OF PROOF.

   Where it is sought to overthrow a prior will made by testator while in good health, with deliberation and free from suspicion, and to establish a posterior will made while he was in feeble health, and in hostility to the provisions of the first one, the prior will must prevail, unless the subsequent one is so proven to speak the testator's intentions as to leave no doubt that it does so.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 457; Dec. Dig. § 179.*]

3. WILLS (§ 55*)—TESTAMENTARY CAPACITY.

   Evidence held to show that when a testator made a second codicil to his will he was not possessed of the requisite testamentary capacity.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–161; Dec. Dig. § 55.*]

4. WILLS (§ 155*)—VALIDITY—"UNDUE INFLUENCE."

   Undue influence which will invalidate a will varies with the strength of the testator's mind, and, if such a dominion is acquired over a person with mind of sufficient soundness and discretion to regulate his affairs in general as to prevent the exercise of that discretion, the person does not have a disposing mind.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*

   For other definitions, see Words and Phrases, vol. 8, pp. 7166–7172, 7823, 7824.]

5. WILLS (§ 164*)—VALIDITY—UNDUE INFLUENCE—PROOF.

   Undue influence invalidating a will is not often the subject of direct proof, and it may be shown by all the facts surrounding the testator, the nature of the will, his family relations, condition of his health and mind, his dependency upon and subjection to control of the person supposed to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

have wielded the influence, the opportunity and disposition of the person to wield it, and his acts and declarations.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

6. WILLS (§ 166*)—VALIDITY—UNDUE INFLUENCE—EVIDENCE.

Evidence *held* to show that a second codicil to a will was not the free and unrestrained act of testator, but was procured through undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

. Proceedings by William D. Ellwanger for the probate of the will of George Ellwanger, in which Helen C. Ellwanger and another contested the probate of the second codicil to the will. Will and first codicil admitted to probate, and probate of second codicil denied.

The answers of the contestants alleged that the decedent was not of sound mind and memory when he made the said codicil, and that the same was procured by undue influence and fraud.

William H. & John P. Bowman (Charles J. Bissell and William A. Sutherland, of counsel), for proponent.
John Desmond, for contestant Helen C. Ellwanger.
George Raines, special guardian for contestant Margaret Ellwanger.
Henry Selden Bacon, special guardian for Julia S. Ellwanger.
Sutherland & Otis, for Laura Brooks Otis.

BROWN, S. This is a proceeding instituted for the probate of a will and two codicils alleged to have been executed by the testator. Issue was joined, and a lengthy contest ensued, in which able and numerous counsel were engaged, and the trial covered over a year from the time of its institution until its submission to the court.

George Ellwanger, a citizen of the city of Rochester, Monroe county, N. Y., died at his residence in said city on the 26th day of November, 1906, after a sickness of over three years, within six days of the ninetieth anniversary of his birth. There has been presented to this court for probate three instruments, one purporting to be a will, and the other two codicils to said will. The will is dated the 14th day of November, 1901, the first codicil is dated 10th day of September, 1902, and the second codicil is dated the 6th day of January, 1904. The will and first codicil are not attacked herein, but objections were filed to the probate of the second codicil by Helen Ellwanger, one of the grandchildren of the testator, and by Honorable George Raines, special guardian of Margaret Ellwanger, another of the grandchildren of testator, both children of Edward S. Ellwanger, a deceased son of decedent, on the ground of the incompetency of the testator at the execution thereof, and of undue influence alleged to have been exerted over the said testator.

This codicil appears to have been signed by the testator in the presence of the two subscribing witnesses, Mr. Maloy and Mrs. Williams, and of the attorney, Joseph S. Hunn, who drew the same; declared by said testator to be a codicil to his last will and testament, in their

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

presence, and the subscribing witnesses were requested by testator to sign as witnesses, which they did in the presence of the testator and of each other. The due formalities incident to the execution of the codicil appear to have been observed in its execution.

The question as to the competency of the testator will be first taken under consideration. The testimony of the subscribing witnesses to the codicil, and of Mr. Hunn, uncontradicted and unexplained, without evidence showing conditions which overcome the effect of their testimony, would establish prima facie that the testator was competent on the day of the execution of such instrument. All these testify positively to his soundness of mind at that time. But other evidence introduced herein, combating the correctness of the judgment of said witnesses as to such competency, requires the consideration of a large amount of evidence, the balancing of conflicting statements, and the deduction of correct conclusions from the contradictory facts shown on the trial herein. To hope to arrive at a correct determination of the issues herein it becomes necessary to go into the history of the testator, of his relations with his family, of the circumstances surrounding him in such relations, before, at, and after the execution of the codicil in question.

George Ellwanger was born in Germany, came to this country a poor boy, settled in Rochester, and as a daily wage-earner started a career in this community of which any man might justly be proud. By perseverance and indefatigable industry, coupled with ability, he soon became one of the founders of the celebrated firm of nurserymen, Ellwanger & Barry, and from that time, through industry, honest dealing, and uprightness of life he acquired a fortune, reared a family, and died at the age of nearly 90 years, leaving a property worth nearly $2,000,000. He was a man of generous impulses, tempered by carefulness, not ostentatious, nor seeking applause of men; imbued with religious devotion, equipped with a fine sense of justice and honor, he was the embodiment of gentility, courtesy, and friendliness.

At and for some time previous to the execution of the will offered for probate herein, and which is not contested, the testator appears to have been in good normal condition for a person of his age, of clear understanding, and of capable discrimination. At this time he had around him his wife, Cornelia Brooks Ellwanger, and also, more or less intimately, his sons, George H. Ellwanger and William D. Ellwanger, both married, with families of their own, and two grandchildren (daughters of a deceased son, Edward S. Ellwanger), Helen Ellwanger and Margaret Ellwanger, the contestants herein, which granddaughters with their widowed mother, Leah Ellwanger, lived on the premises next adjoining the house of the testator. Previous to this time another son, Henry, had died, leaving no descendants.

Mr. Ellwanger, with true German proclivities, believed in holding the reins of his own business and of retaining the purse strings of the family himself, and, instead of settling a sum on each branch of his family and leaving each to work out its own destiny, rather made allowances to each child and to the grandchildren, children of the said Edward S., deceased, and also to his widow. On occasions he made

extra.contributions to some of them (if not all of them) when their financial wants seemed to justify the testator in so doing.

Mr. Ellwanger had, previous to the execution of the will offered for probate herein, made several wills, in some of which, and in the one then in existence, he had made some provision for Leah Ellwanger, widow of said Edward S. As before stated, the said widow and her children lived next door to the testator, and next beyond their home resided the eldest son, George H. Ellwanger. Sufficeth to say, for some reason or other, friction seems to have arisen between this son and his family, consisting of a wife and three daughters, and Leah Ellwanger and her family, and at the time under consideration some fresh hostilities had broken out, which were brought to the attention of the testator. About the same time it appears that his sons, George H. and William D., learned or surmised that Mr. Charles M. Williams, the attorney who had been consulted concerning the preparation of some of the wills of Mr. Ellwanger and had drawn them, was named as a coexecutor under the will. They had objected to their father to Mr. Williams' being such coexecutor, on the ground that no one outside of the family was necessary, and, while Mr. Williams was highly valued as a friend by Mr. George Ellwanger, the fact of the desire of his sons to have this change made seemed to disturb him. He went to Mr. Williams and asked him if he had told any one of his (Williams) being one of the executors named under the will. Williams told him "No," and he then explained to Mr. Williams that he wanted to make a new will, told him of his embarrassment relative to retaining him as an executor, and Mr. Williams assured him not to be disturbed about that, but to leave him out. A new will was made under the instructions of Mr. Ellwanger, and Mr. Williams was left out as executor. This will was drawn with great care, shows evident consideration and careful deliberation on the part of Mr. Ellwanger, and care on the part of Mr. Williams in drawing the same. It provided for the wife of the testator, makes divers legacies, does not make any mention of Leah Ellwanger in its provisions, and leaves his residuary estate eventually in three equal parts, one to George H. Ellwanger, one to William D. Ellwanger, and the third share to the grandchildren Helen and Margaret, the representatives of the deceased son Edward S., to be divided equally between them. The terms of the will were broad enough to pass all the property of the testator, even if the wife of the testator died before he did. Under this will, however, instead of leaving the house and lot next to George Ellwanger occupied by Leah and her daughters to the said daughters, as done in the previous will, the testator directed the payment of $6,000, to be divided between them. We observe here the influence of the family quarrel upon the just, generous, and honest George Ellwanger when in normal state. Evidently fearing the unpleasant relations between Leah and George H., he appears to have thought best to deprive them of living side by side and give $6,000 to the grandchildren instead. We must remember that this was done while the new outburst of the unpleasantness was not far removed; but we wait a few months longer, and in the following September, 1902, Mr. Ellwanger, after time for thought and contemplation, goes again to Mr. Williams and has a codicil pre-

pared, and which he executed, and which is the first codicil to his will, and is offered for probate herein without objection.

At this time he appears to have been of sound mind, and capable of careful consideration and of due discrimination. In this codicil, under the second item thereof, he gives to the grandchildren, Helen and Margaret, the privilege of having the home where they reside or the $6,000 given them in the will, at their option. We here observe that justice appealed to George Ellwanger, and he then, in normal condition, after the first effects of the new quarrel had passed away, after weighing the merits of the controversy between George H. and Leah, performed another act of deliberate judgment, and recognized the justice of leaving the home in which these grandchildren had been born and brought up to them at their option, if they desired to remain there, still giving them the privilege, if they preferred, of taking the $6,000, recognizing that it might be possible that on·account of the strained relations between their mother and George H. and his family they might prefer not to stay, but he left it to them to decide between having the home or the $6,000.

This is one of the features of this case which appeals to the court, showing the eminent fairness, the equitable judgment, the honest purpose of George Ellwanger in disposing of his wealth under the provisions of wills. Calmness prevailed, and justice was done. The residuary provisions of the will proper were not interfered with, and, taking the two instruments together, Helen and Margaret still were beneficiaries for one-third of the residuary estate, to be divided between them, share and share alike. The provisions of the will and this codicil together stand as the testamentary wish and purpose of George Ellwanger, executed after careful thought and calm deliberation, while of sound mind, and with no suggestion of incompetency to execute a testamentary instrument, and free from any intimations of undue influence, and they stand before this court without objection.

In the winter of 1902 and 1903 Mr. Ellwanger was taken sick and· was in a serious and weakened condition for several months, but apparently recovered and was enjoying fair health for one of his age in the summer of 1903, when in August his wife died. After a long and happy married union her sudden death naturally affected his sensibilities, caused him for some time to mourn and shed tears during the fall of that year, and on the 6th of November, 1903, he was taken with an attack which deprived him of the power to walk without assistance. It was an attack of what in common language is called "apoplexy." The physician in charge was unable to say whether it was thrombosis, embolism, or hemorrhage. It is from this time that the history of this case becomes of great importance in determining the mental condition of George Ellwanger two months later, when the second codicil was executed.

An eminent physician, Dr. William S. Ely, was in attendance, and, as the witness called on behalf of the court, was examined very minutely as to the progress of the case, and upon the medical authorities upon the subject of mental incompetency. It appears that he gave instructions that his patient must be kept very quiet, relieved from care and anything that would disturb him. A trained nurse, Miss Eleanor

Langstaff, was called and had charge of the patient until December 31st, when another trained nurse took her place. Miss Langstaff has also testified as to the condition of Mr. Ellwanger while under her observation. The nurse's notes are in evidence, and the testimony of other assistants and subsequent nurses has been heard, as well as friends who called upon the decedent during this period and later periods.

We find Mr. Ellwanger soon after his attack of apoplexy gradually improving from the immediate effects of the attack, but never fully recovering the use of his limbs so as to be able to walk alone. His general condition improved until about December 30, 1903, when a set-back occurred, and for about a week or more a weakened and excited condition appears; his physical condition showed symptoms of mental trouble; hallucinations and delusions occurred; the patient imagined on waking in the morning that he was away from home stopping at a hotel, imagined that a comb in the hands of a nurse was a cigar, asked if it is his room that he is in. The nurse's record during that period shows Mr. Ellwanger at times irrational; refers to his being "more rational" at some times than others; and Miss Langstaff's testimony corroborates such existing conditions, and this is further corroborated by the testimony of Maggie Shearer. During this period Miss Langstaff and Maggie Shearer, who assisted her in the care of Mr. Ellwanger, had the best and most complete opportunity of observing Mr. Ellwanger's condition. These two saw him more during this period than any other one individual. The fact that these conditions existed is more potent in determining the mental condition of George Ellwanger than the testimony of dozens who occasionally and only for a few moments personally met Mr. Ellwanger. A man may retain some of his faculties, he may be able to act the part of a gentleman, he may be able to converse automatically, or on subjects with which he is very familiar, to pass the time of day with acquaintances or friends, or even members of the family, and yet during the same period of time he may show mental alienation, hallucinations, and delusions. The fact that a man's mind is wandering, that he does not know whether he is at home or away from home, shows that something wrong is operating in his brain, even though he is not in that condition all of the time.

These conditions, it must be remembered, occurred after the first effects of his attack of apoplexy had passed away, and Dr. Ely says that they were not the result of the first effects of that attack. Whether the causes which produced these secondary symptoms produced the attack of apoplexy, or whether these conditions were the secondary symptoms of the attack of November 6th, is immaterial. It does appear that these secondary symptoms occurred and existed before January 1, 1904. They certainly show a disturbed brain condition. Dr. Ely says that they were regarded by him as local, temporary conditions. We feel, from other evidence of the doctor, that we must consider that deeper causes then existed than the doctor supposed from his then observation of the case.

The doctor tells us that at this time Mr. Ellwanger was on the border line between senility and senile dementia, although in his judg-

ment, as he viewed him at that time, he was of sound mind. He had never personally observed up to that time an act of unsoundness, but up to that time it does appear that the doctor had made no special test to test the soundness of his mind. Dr. Ely testified: "I did not talk with him on subjects of any great significance during that winter." He had been watching his physical symptoms, and trying the strength of his hands, to see what if any difference existed between them. He, however, about the 25th of December, upon discovering that business matters were brought to Mr. Ellwanger (at least as far as having him sign checks), advised Mr. Ellwanger to give a power of attorney to his son George H. Ellwanger to attend to his business, telling him on account of his weakened brain he wished all business cares to be taken from him. A power of attorney was executed on that day, and subsequently acknowledged on the 31st, at which time another power of attorney was given to George H. Ellwanger relative to matters of business at the Flour City National Bank. At this time Dr. Ely was trying to save a sick man with weakened brain from unnecessary worry and care, hoping to have his condition improve by saving him from the care and worry that would retard his improvement, if not prohibit it.

Having now an insight into the possible unsound condition of mind of George Ellwanger just previous to the execution of the codicil of January 6, 1904, let us consider a condition which appears to have existed a few months later. On July 13, 1904, Mr. George H. Ellwanger called on Dr. Ely and requested him to examine his father as to his mental condition, and to send him a certificate thereof. Dr. Ely requested Dr. Dewey, a well-known physician of this city, to accompany him upon such examination. Both at the same time called on Mr. Ellwanger, and both have testified that they found him to be of unsound mind at that time, and Dr. Ely says that both signed a certificate to that effect, and he delivered the same to George H. Ellwanger. On or about March, 1905, both again, at the request of George H. Ellwanger (but for what purpose does not openly appear), examined George Ellwanger, and they have testified that they found him of unsound mind at that time, and a second certificate was made, which was delivered to George H. Ellwanger.

The testimony of both Dr. Ely and Dr. Dewey shows that Mr. Ellwanger was, without doubt, of unsound mind on July 13, 1904, and also in March, 1905; that the cause of such unsoundness was of a progressive character; and it appears that said condition continued and progressed until the death of the testator, on the 26th day of November, 1906, when he suddenly died, the direct cause of death being unknown to the attending physician, who was not present at the time.

Now, if George Ellwanger was of unsound mind in July, 1904, affected by progressive brain trouble, whether the effects of arteriosclerosis, thrombosis, embolism, or atheroma, and it appearing, as already shown, that he had had an attack of apoplexy on November 6th preceding; taking into consideration his advanced age; discovering about six or seven weeks after the attack conditions attributable

to secondary effects of such an attack, after the first effects of the attack had passed away—we are irresistibly led to the conclusion that George Ellwanger was in a very weakened condition of brain at the time of the execution of the codicil, and that we must consider how extensive an act was performed by him in making that codicil, whether much or little thought and deliberation and consideration were required to make it, and whether he had sufficient brain capacity to realize fully what he was doing; for, with the mental conditions appearing here, we must be satisfied that the codicil executed under those conditions is not revolutionary of the previous acts of the testator while in a normal condition, unless some sound and reasonable cause is shown therefor. We thereupon turn to the codicil in question and find that it very substantially reduces the residuary estate, by giving a large block of his most valuable stocks, to wit, all of his stocks in the Ellwanger & Barry Realty Company, the Eastman Kodak Company, the Rochester Trust & Safe Deposit Company, and the Flour City National Bank, to George H. Ellwanger and William D. Ellwanger, share and share alike, and further depriving Helen and Margaret of the option to hold the house in which they lived, giving them the $6,000 between them, as stated in the original will. This change in the residuary estate of testator is a radical departure from the scheme of George Ellwanger in all of his previous testamentary acts, as far as shown in this proceeding. The amount of the stock so transferred from the residuary estate created by the will and first codicil to George H. and William D. Ellwanger under the provisions of the second clause of the second codicil was worth at the time of the making of such codicil about the sum of $826,142, and by this change by said codicil these two contesting grandchildren would have been deprived of about $275,000 had George Ellwanger died immediately after the execution of said codicil, and provided the same was adjudged valid. The stocks have since increased in value, and would make the loss to them now still greater. Such discrimination and change must be accounted for when a man so enfeebled, only a few days before irrational, and only a few months after declared to be of unsound mind, makes such revolutionary acts of testamentary disposition.

The great, broad, and intelligible question is, whether the mind of George Ellwanger was sound, whole, compos, or whether a portion of its thinking, deliberating, and judging powers, as connected with the subject of the will and first codicil, were mangled and perverted at the time of the making of the second codicil, so as to leave it incapable of interfering with his former disposition of his estate with judgment and discretion.

The degree of mind that a testator must have to make a will is well established.

"It is essential that the testator shall have sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were or might have been the objects of his bounty, and the scope and bearing of the provisions of his will; and sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to per-

ceive at least their obvious relations to each other, and to be able to form some rational judgment with relation to them." Delafield v. Parish, 25 N. Y. 9, 29.

"By law it is not sufficient that the testator be of memory when he makes his will to answer familiar and usual questions, but he ought to have a disposing memory, so that he is able to make a disposition of his lands with understanding and reason, and that is such a memory which the law calls sound and perfect memory." Marquis of Winchester Case, 6 R. 23a.

"That when it is sought to establish a posterior will to overthrow a prior one made by the testator in health, and under circumstances of deliberation and care, and which is free from all suspicion, and when the subsequent will was made in enfeebled health, and in hostility to the provisions of the first one; in such case the prior will is to prevail, unless he who sets up the subsequent one can satisfy the conscience of the court of probate that he has established a will. And also the prior will is to prevail, unless the subsequent one is so proven to speak the testator's intentions as to leave no doubt that it does so speak them." Delafield v. Parish, 25 N. Y. 35.

Proponents have attempted to show some reasons for such change of testamentary disposition—dissatisfaction with Leah Ellwanger, the mother of Helen and Margaret, some careless acts of Margaret in coming into her grandfather's room, the slighting of George H. and Mrs. George H. by Leah and one of the daughters, and the further desire of the testator to have his local stocks held in block. Only one of these was a new cause to affect the testator. The others were as strong to appeal to the judgment of George Ellwanger when he signed the will and first codicil. No greater reason for holding stocks in block existed when this feeble old man made this codicil than when, in vigor, after due deliberation, he made a division of his property under the will and first codicil. The question of Leah's errors in not keeping in touch with the family of George H. was tried out when George Ellwanger was of sound mind, and she was cut out of any benefaction under his will, but the children of the blood of his son Edward S. Ellwanger had been protected by this testator, who regarded blood as thicker than water, and who, amidst all these provocations, had the justness not to punish his grandchildren for the mother's inability to keep peace with George H. and his family.

The story of the failure to recognize Mrs. Harriet S. Ellwanger, and the sneering at her, is a weak attempt to show an influence operating upon George Ellwanger, but it falls to the ground when we recall that for several years George H. Ellwanger would not allow a family reunion to enjoy his presence if Leah and her children were to be present. The old man when sound of mind overlooked these family differences, and nothing of greater moment or of new import is shown to have come to his notice beyond what he had substantially already understood. What if the nieces of George H. did not recognize him? His conduct toward them and their mother justified not recognizing him, and George Ellwanger in sound mind appreciated it, and did not allow the family differences to lead him from the paths of justice toward his grandchildren, and the story of his concern during his sickness over such failure to recognize George H. is to this court an evidence of the weakened mentality of George Ellwanger several weeks before the making of said codicil. The childish acts of Margaret in occasionally leaving her wraps on the couch in her grandfather's room is another puerile excuse for the change, and, if considered worthy of

serious consideration, would be another sign of senile decadence of the testator.

The history of George Ellwanger during the two months from said attack to the time of the making of the codicil in question shows a complete breakdown, with a struggle to regain strength, a loss of initiative, except in a few instances, a complete loss of interest in his business, a full surrender to the wishes of others, except on occasional instances. Mr. Maloy, his trusted secretary, brought checks for him to sign during a portion of said two months. He signed them without question, saying sometimes, "You know if it is right." George H. Ellwanger secured powers of attorney, without comment on the part of the testator, within a few days of the time of the making of the codicil.

The proponents insist that the evidence of members of the family, the witnesses to the execution of the codicil of Dr. Ely, and the occasional callers, proves the competency of the testator. In the first place, the witnesses to the codicil testify to their own views as to his competency, and those views are not reliable. For instance, Mrs. Williams was so obtuse an observer of George Ellwanger that she testified that she never observed any weakness of mind in him down to the time of his death, and yet it is undoubtedly shown that he was of unsound mind in July, 1904, and grew more so gradually until his death. Hence, her view of his mental condition is of little or no account. Mr. Maloy's view was of automatic actions, with little evidence of facts, except the superficial forms of things at the time of the execution of the codicil, and cannot prevail against the general evidence of a weakened brain. Mr. Maloy's statement that Mr. Ellwanger during his sickness never referred to the $90,000 note given by Mr. Ellwanger before his sickness to the Rochester Trust & Safe Deposit Company shows a lack of interest or appreciation by George Ellwanger of his affairs. This secretary called often on him, yet no question is put to him concerning that note, and, in fact, so little interest in his affairs is shown to have been taken by Mr. Ellwanger, by the testimony of Mr. Maloy, in the vital matters of his business, that no other reasonable conclusion can be reached than that Mr. Ellwanger's mental powers were so weakened that he did not recognize or recall anything definitely about them.

Mr. Hunn, who prepared the codicil, presented the same to a weakened old man in the afternoon of the day that he was requested to prepare the same, and attended to the execution thereof. The answers of Mr. Ellwanger to the questions put upon the execution thereof were monosyllabic answers. He says that Mr. Ellwanger was then of sound mind, but that does not prove that George Ellwanger was not enfeebled mentally at the time so as to be unable to consider the result of his actions in the execution of that codicil, and we must remember that this same Mr. Hunn as an attorney drew and was present at the execution of a power of attorney to William D. Ellwanger after George H. Ellwanger's death in 1906, when there can be no doubt that George Ellwanger was incompetent. It is to be assumed, of course, that Mr. Hunn would not have participated in the preparation of that power of attorney had he then understood that George Ellwanger was of

unsound mind.   Hence the judgment of Mr. Hunn as to the mental condition of Mr. Ellwanger at the time of the execution of the codicil in question can have no weight in the consideration of this case.

Dr. Ely's testimony has already been considered.   His personal judgment at the time is in conflict with the weight of medical authority, taking into consideration all of the conditions shown in this case, and we are particularly led to so view it from the fact that the doctor himself made no special mental test examination of Mr. Ellwanger at or about the time of the execution of this codicil, not at that time having any known reason for so doing, and was on the border line of senility and senile dementia.   Dr. Ely did not concern himself with the mental symptoms of Mr. Ellwanger in his treatment of his case.   He was treating the physical symptoms alone.   He did not regard the reports of the nurse as to hallucinations and delusions as having any special significance in his treatment of his physical symptoms, as he expected such manifestations in a man of Mr. Ellwanger's age and with the physical symptoms which he exhibited.

The evidence of personal friends who had called upon Mr. Ellwanger is not conclusive, for the reason that the testimony that is given of Mr. Ellwanger's conversations did not show anything that necessarily proved that he was of sound mind.   The conversations and acts testified to were mainly automatic, or of a character that even a weakened mind of a person who had the learning, training, and gentility of George Ellwanger would naturally be able to reflect with a weakened mind.   Dr. Ely testifies that the traits of gentility of George Ellwanger continued, even through the period in which the doctor testifies that he was of unsound mind.   Dr. Ely further testifies that there was a time when this unsoundness was in existence that the ordinary observer without testing Mr. Ellwanger would not observe any mental trouble.

The evidence of Mr. McDonald, the barber who attended Mr. Ellwanger, and others in attendance on him, shows the existence at times during the same period of time of weakened brain conditions and irrationality.

The facts of the history of the medical case of George Ellwanger present a case of an old man, on the road of senile dementia, affected with a brain trouble, progressive in character, and fatal in prognosis, covering a period of a trifle over three years from the time of the attack of apoplexy on November 6, 1903, and with unsoundness of mind positively shown to exist on July 13, 1904, and presumptively shown to have been in existence by the secondary symptoms following said attack developing about December 20, 1903, being about seven weeks after the apoplectic attack, and after the first symptoms of said attack had passed away.   With this condition existing in the brain of a man 87 years old, with such an honorable history for justice and equity as shown in this case, the making of a codicil so revolutionary in its character, with no sound reasons given for the making of the same, taken in connection with the weight of evidence tending to show his mental condition at and about the time of the execution of said codicil, establishes conclusively to this court that the testator was not at the time of making said codicil of January 6, 1904, of sound

114 N.Y.S.—47

mind, not capable of appreciating the conditions of his property as a whole, not able to realize his obligations to the various members of his family, not of sufficient mental strength to weigh the situation of his affairs, or of the calls upon him of those who were entitled to his bounty, and that George Ellwanger at the time of the execution of said second codicil had not a sound memory, nor sufficient mind, nor a mind in a proper state, for disposing of his estate with reason, or according to any fixed judgment or settled purpose of his own.

As to whether the codicil in question was procured through undue influence practiced on the testator has been a very serious question for the consideration of the court. In addition to the feeling shown to have existed between George H. Ellwanger and the family of Leah Ellwanger, showing the hostility of George H. toward them, there appears evidence, which seems worthy of credit to this court, of remarks of George H. Ellwanger to his father, saying, in substance, that Leah and her children deserved to be kicked out into the street, and that they were getting too much already. This was said at about Thanksgiving time, 1903, between the time of the attack of apoplexy and the making of the codicil, when George H. was asking his father to give some Pennsylvania Railroad stock to his two married daughters, upon George Ellwanger's saying that if he gave them some the little girls (meaning Helen and Margaret) should have some also. Later, in the spring of 1904, George H. succeeds in having this request granted, and the Pennsylvania Railroad stock is transferred to the two married daughters of George H., but no stock is transferred to Helen and Margaret. The continued attention of George H. Ellwanger on his father, from November 6, 1903, to January 6, 1904, calling upon him two or three times a day, and his attempt during such period to secure the assistance and influence of Miss Langstaff to induce his father to dispense with the calls of Dr. Crapsey, the rector and pastor of the decedent, on the ground that he (George H.) was afraid Dr. Crapsey would get his father to give money to the church, a fact corroborated by Maggie Shearer's homely way of putting it—that she heard George H. say that he did'nt want Dr. Crapsey pulling his father's leg—shows his disposition to control his father; and the rule enforced in the household by George H. Ellwanger, that Dr. Crapsey should not see his father except in his presence, is evidence of control over his father.

There also appears the further attempt of George H. Ellwanger in his father's early sickness, near Christmas time, to impress upon his father the great expense of his sickness and the need of the reduction of expenses—which was entirely unwarranted, owing to the large estate possessed by George Ellwanger. His influence in securing his father's ready signature to the powers of attorney, his going to Maloy and asking him to get his father's will and take it to him, coupled with his taking the same with Maloy to the trust company for safekeeping; his apparent attempt to appear ignorant of what was going on relative to the making of the will; his presence at the house at the time of the call of Mr. Hunn to attend to the execution of the codicil, as shown by the witness Maloy; and the further fact of Maloy's denial of his (Maloy's) telephoning to Mr. Hunn to call on George Ellwanger

(this being the reason assigned by Mr. Hunn for his making the call on Mr. Ellwanger when he received directions to make said codicil) ; the inquiry of George H. Ellwanger of Mr. Hunn concerning the provisions of the codicil, and upon Mr. Hunn's refusal to tell him his saying he was "Sorry," and later showing his knowledge thereof by directing Mr. Maloy how to handle the Flour City National Bank stock proceeds, because he said that was disposed of by the will; the employment for drawing this codicil of Mr. Hunn, a former law partner of William D. Ellwanger, and the intimate and adviser of George H. and William D., instead of the attorney who had drawn the will and first codicil, and who was a valued friend of George Ellwanger, and independent of any influence of George H. or William D.—all point to the controlling hand and mind of George H. Ellwanger in the making and execution of this codicil. The fact that George H. Ellwanger, after securing the certificate of unsoundness of mind of his father in July, 1904, subsequently took a power of attorney to sell real estate, in September thereafter; and following this up by another certificate of unsoundness from the doctors, further shows the purpose of George H. Ellwanger to control the situation, and his attempt to be prepared to contend with any other person or persons who might, perchance, secure any favors from George Ellwanger in his unsound mental state.

From the time of the sickness of testator in November, 1903, to the time of his death in November, 1906, George H. Ellwanger drew from his father's property, as shown by the testimony of Mr. Maloy, the sum of $134,014.25; William D. Ellwanger drew from his father's property, as shown by said testimony, $87,802.41; and Mrs. Edward S. Ellwanger drew from the father's property, as shown by said testimony, $9,542.52—making a total of $231,359.20.

The immediate drawing of money under the power of attorney for his own personal benefit by George H. Ellwanger, followed up by his paying out of the funds of his father such sums to himself and William D. Ellwanger as appear by the evidence herein to have been paid under such powers of attorney, a disposition of funds so radically different from the method and course of his father while in normal condition, and by which conduct the funds and property converted into cash and paid out depleted the residuary estate, gives the appearance that, with his knowledge of the codicil, he held on to the stocks passing thereby, or of the proceeds of the same, whenever it became necessary or desirable to sell them, and made the payments out of the other funds, which would, if remaining on hand at the death of his father, compose a part of his residuary estate.

It appears that at a time after Dr. Ely had on two occasions, at the request of George H. Ellwanger, made an examination of George Ellwanger and reported that he was of unsound mind, a note of $28,000 was made and signed by George H. Ellwanger by virtue of his power of attorney, and collateral of his father turned over to secure the same, and which he caused to be discounted, and the fund realized therefrom turned over to his own wife's account.

The natural conclusion is that George H. Ellwanger, relying on this codicil and certificate of the unsoundness of mind of his father, as-

740 NEW YORK SUPPLEMENT. (Sur. Ct.

sumed that he could go to any length in distributing the estate of his father in his father's lifetime, relying on his unsoundness of mind as a protection from accountability to him, and so long as he made sufficient division with his brother William D. Ellwanger. It has been intimated that reasons can be given at a proper time for these acts, but the acts themselves furnish to this court evidence of the intent of George H. Ellwanger, entirely aside from the legal effect of the transactions.

These considerations, coupled with the domineering character and violent temper of George H. Ellwanger, as shown by the evidence herein, and of his father's appreciation thereof, taken in connection with the weakened mental and physical condition of the testator at and preceding the making of said second codicil, and the other acts of influence, dominion, and control shown to have been exercised by George H. over his father, seem to the court to bring this branch of the case under the application of the following legal principles:

"If a dominion is acquired by any person over a mind of sufficient sanity for general purposes, and of sufficient soundness and discretion to regulate his affairs in general, yet, if such dominion or influence were acquired over him as to prevent the exercise of such discretion, it would be equally inconsistent with the idea of the disposing mind." Delafield v. Parish, 25 N. Y. 23.

In Rollwagen v. Rollwagen, 63 N. Y. 504, the court says:

"That the amount of undue influences which will be sufficient to invalidate a will must of course vary with the strength or weakness of the mind of the testator; and the influence which would subdue and control a mind naturally weak, or one which had become impaired by age, sickness, disease, intemperance, or any other cause, might have no effect to overcome or mislead a mind naturally strong and unimpaired.

"The undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the persons supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person."

In the case of McLaughlin v. McDevitt, 63 N. Y. 213, the court says:

"Where a change is made in the will of a sick man, which, judging from the ordinary motives actuating men, is unnatural and is apparently contrary to his previous fixed and determined purpose, it is the duty of the courts to scrutinize closely with a view of ascertaining whether the act was free, voluntary, and intelligent. To establish fraud and undue influence in such case, it is not necessary that the precise mode of committing the fraud should be proved."

"A testatrix, 81 years of age, but of sound disposing mind, having two sons, by one of whom she had five grandchildren, after going to reside with the other son, revoked a previous will by which she had divided her estate equally between her sons, and executed a new will drawn by the one with whom she was living, and giving her estate to him, to the exclusion of her other son and all her grandchildren. Held that, on the question of undue influence in such a case as this, it was proper to inquire into the reasons for such a disposition of the property, the probability that it was stimulated by the suggestions of those attending her, and the fact that they refused to allow the disinherited son to have private interviews with the testatrix was pertinent; and that under all the circumstances a verdict annulling the will for undue influence must be sustained." Marvin v. Marvin, 3 Abb. Dec. 193.

In the Matter of the Will of Budlong, 126 N. Y. 423, 27 N. E. 945, the judge charged the jury as follows:

"If, under all the circumstances of the case, you find that this will was unnatural in its provisions and inconsistent with the duties and obligations of the testator to the different members of his family, it imposes upon the proponents the duty of giving some reasonable explanation of its unnatural character, or at least of showing that it was not the result of mental defect, obliquity, or perversion."

Judge O'Brien, writing the opinion, uses the following language in this case:

"The fair construction of the portion of the charge excepted to is not that the unequal division of the testator's property, apparent on the face of the will, raised a presumption of undue influence or fraud, which the proponents were called upon to explain; but, if upon all the proof in the case, the jury should find that the will was in fact contrary to the dictates of natural affection, and was, under all the circumstances, unnatural in its dispositions, so far as its provisions would be evidence of mental defect, obliquity, or perversion of mind which would require explanation."

Judge O'Brien further states as follows:

"A learned author on wills has stated the principle in the following language, which we think expresses substantially the same idea as that intended to be conveyed by the charge, if it does not go even farther: 'But gross inequality in the dispositions of the instrument, when no reason for it is suggested either in the will or otherwise, may change the burden and require explanation on the part of those who support the will to induce the belief that it was the free and deliberate act of a rational self-poised, and clearly disposing mind.' If, upon a careful and accurate consideration of all the evidence on both sides, the conscience of the court is not judicially satisfied that the paper in question does contain the last will of the deceased, the court is bound to pronounce its opinion that the instrument is not entitled to probate. It is not the duty of the court to strain after probate, nor in any case to grant it where grave doubts remain unremoved and great difficulties oppose themselves to so doing." Delafield v. Parish, 25 N. Y. 34, 35.

Taking all the circumstances shown by the evidence in this case together, the radical change in the testamentary intention, the old age, and the then mental and physical condition of the decedent; the fact that George H. and William D. were largely benefited by the codicil in question, to the great disadvantage of their deceased brother's children, Helen and Margaret; the evident intention before the making of such codicil to treat the three branches of the family substantially alike; that in the making of the said codicil the decedent acted without independent advice—I am convinced that a case was made which imposed upon the proponent the burden of satisfying the court that this codicil was the free, untrammeled, and intelligent expression of the wishes and intentions of the testator. The proponent has not satisfied the mind of the court upon that subject. I am not judicially satisfied that the codicil of January 6, 1904, speaks the free and untrammeled wishes and intention of George Ellwanger, but, rather, I am led to the conclusion that the second codicil offered herein for probate was instigated and procured through the undue influence of George H. Ellwanger upon the said George Ellwanger, and that the same was not the free and voluntary acts of George Ellwanger.

In recapitulation, I find as matters of fact:

First. That George Ellwanger, the decedent, executed, acknowledged, published, and declared the will bearing date November 14, 1901, and the codicil thereto bearing date September 10, 1902, both offered for probate herein, in accordance with the statute of the state of New York, when of sound and disposing mind and free from restraint.

Second. That George Ellwanger (a) was not of sound and disposing mind at the time of the making of the codicil offered herein bearing date January 6, 1904, and that he was mentally incapable of executing a will or codicil at that time; and (b) that the said codicil of January 6, 1904, was not the free and unrestrained act and deed of the said George Ellwanger.

I find as conclusions of law:

First. That the said will of George Ellwanger, bearing date November 14, 1901, and the said codicil thereto, dated September 10, 1902, offered for probate herein, are entitled to be admitted to probate, as sufficient to pass real and personal property, and that the same should be admitted to probate.

Second. That the codicil offered for probate herein, dated January 6, 1904, is not entitled to probate, and that probate thereof should be denied.

Let detailed findings be drawn in accordance with the above decision, and a decree entered thereupon, upon three days' notice, for settlement thereof, at which time applications for costs and allowances may be made, to be inserted in the decree.